**Polly M. HEWLETT, Plaintiff in Error,**

v.

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Aug. 16, 1974.

Certiorari Denied by Supreme Court

Dec. 30, 1974.

Collier Goodlett, Jr., Edd S. Hurt, Jr., Clarksville, for plaintiff in error.

David M. Pack, Atty. Gen., Alex B. Shipley, Jr., Asst. Atty. Gen., Nashville, Noel R. Bagwell, Dist. Atty. Gen., Clarksville, for defendant in error.

OPINION

O'BRIEN, Judge.

Defendant was indicted for first degree murder. The jury found her guilty of second degree murder in the homicide of her

husband, and sentenced her to not more than fifteen years in the Penitentiary. Judgment was entered for a term of not less than ten years nor more than fifteen years, and defendant appeals.

By the first assignment is is contended that the evidence preponderates against the verdict of the jury and in favor of defendant's innocence.

The evidence in the record shows that defendant and her husband owned a residence in the vicinity of Clarksville, Montgomery County, which they apparently proposed to sell. The husband was working and living in Nashville while defendant resided with her stepfather and grandson elsewhere in Clarksville. On March 17th, 1972, the victim's time card shows that he clocked out from his place of employment at Vanderbilt Hospital at 8:57 P.M. on the night of March 17th. About 3:30 in the morning of the 18th the police were notified of his death by defendant, and others with her, who had discovered the body in the residence of the parties.

Officer James Bryant of the Clarksville Police Department aided in the investigation. The body of the deceased, fully clothed, was found lying on the floor in a bedroom. There was blood on the hallway wall at about head height, splattered on the floor of the bedroom between the door and the bed, and more splattered on the bed, with a large area covered with blood in the immediate vicinity of the body, tending to indicate deceased had been shot in or near the hallway and had staggered to the point where the body was found. The blood spots were beginning to coagulate. Examination of the body disclosed deceased had been shot several times about the head and upper part of the body with a .22 caliber weapon. A paper bag, with blood on the outside, containing two canned soft drinks, an orange and a 7-Up, was found just inside the bedroom door. A third can was lying on the floor. The paper sack also contained a cash register receipt from a local food market. It had been raining on the night of the homicide and the officer made an examination for foot prints on the grounds and the area at the rear of the house. He found none. There was no evidence of forcible entry into the residence although a chain lock on an inner door had been forced, and the door facing was broken. None of the screws utilized to hold the chain latch in place could be found in the residence. There were no signs of any struggle inside the house. Defendant was arrested in the course of the investigation, and a search of her automobile was made, in which a .22 caliber derringer was found. Ballistics tests indicated this was not the murder weapon. The police officers accounted for seven shots being fired in the house. It appeared the victim had been shot at close range.

Mrs. Mary McCray, employee of the Ma-Jik Mart Food Store, testified that the cash register receipt found in the paper sack in the bedroom was dated March 19th, 1972. It was the practice of the store to postdate their cash register two days for bookkeeping purposes, because they had to send the paper work into Atlanta. The sales slip showed three purchases at $.17 each. At that time the only item in the store that sold for $.17 was canned drinks. Defendant was in the store on the night of March 17th, 1972, between the hours of 9:00 and 11:00 P.M. and was waited on by this witness.

Lt. Bill South, Clarksville Police Department, testified he had known defendant and her husband for a number of years. About two or three weeks before the homicide defendant had called him to her home on Lafayette Road to make a complaint about her husband. In response to a statement by him about getting a divorce she replied, "No, Sir, I don't think I could do that, it looks like I am going to have to kill him."

Through the testimony of Mrs. Carrie Heath, Criminal Court Clerk, a State warrant, dated May 1st, 1967, was introduced charging defendant with assault and battery with intent to kill with a pistol. She testified defendant's husband was the vic-

tim in that case. Defendant was fined $50.00 and cost on a charge of criminal assault.

Ralph W. Davis testified that in November of 1971, Leroy Hewlett had come to his place of business with a wound in his shoulder blade. The witness called the police and Hewlett was taken to the hospital. The next day defendant came to his service station and inquired if he was the person who had called the police. On that day she stated her husband had denied that she had shot him, and she was going to the newspapers to have the report of the incident corrected. On cross-examination the witness confirmed that at the preliminary hearing his testimony was to the effect that defendant had told him if she had not hit the gun they would have killed him, indicating that some other persons had assaulted the defendant on that occasion.

Daniel Dix, whose testimony was very confused at best, testified that on the night of the homicide he went to the home of Josephine Rawlings (Ramirez) about 9:00 o'clock P.M. At about 11:00 P.M., a time which he fixes by the closing hour for a local grocery store, defendant came to the Rawlings house. Sometime later after Mrs. Rawlings had completed dressing the three of them left her home and went to the Elk's Club, in defendant's automobile. Enroute defendant made the remark that it was about 9:00 o'clock. They had some drinks at the Elk's Club and were joined by a person named Emmett Metcalf. Sometime later in the evening defendant, Josephine Rawlings, Emmett Metcalf and the witness left the Elk's Club together to go to defendant's house on Lafayette Road. She told them she was going to carry some bed linens to her husband. Witness was riding in the front seat with the two women, Metcalf was in the back seat. They arrived at the house and pulled into the driveway. Defendant inquired whether they had seen a man running from the house. It is his testimony that he saw no one. He and the two women got out of

the car and went to the house. Defendant was making some comment to Mrs. Rawlings to the effect that Leroy was in the house and was teasing her. They entered the house and found Hewlett's body. Josephine Rawlings, who was leading with a flashlight came running back by him and said, "Leroy is dead", and ran out and on down the street. Defendant was standing there beside the wall. He obtained the flashlight from Mrs. Rawlings, re-entered the house, saw the body lying in the bedroom. He went out and suggested that the police be called. Mrs. Hewlett said there was no phone. They returned to the car and drove to the police station.

On cross-examination he restated the time he arrived at the Rawlings house to be 7:30 or 8:00 P.M. He was accompanied by a person named Jackson, who remained there about 30 minutes. He, Jackson and Mrs. Rawlings shared a half pint of whiskey. After Jackson left, Mrs. Rawlings went to the grocery and purchased a six pack of beer just as the store was closing. As they were drinking the first beer defendant arrived. He fixes the hour to be about 11:00 P.M. as the usual closing hour of the store. In about 30 minutes they departed for the Elk's Club. Prior to leaving the Rawlings home defendant had asked them to ride out to the house with her, offering to buy them a drink first, and then bring them back to town. Two half pints of gin were purchased at the Elk's Club which were consumed by various people sitting at the table, including defendant. Emmett Metcalf joined them at the Elk's Club. Later that night both were arrested for public drunkenness by the officers. He says that defendant made the comment about it being 9:00 o'clock before they left the Rawlings house and again while they were traveling to the Elk's Club. Josephine Rawlings was calling Leroy after they arrived at the Hewlett house and had gotten out of the car. Defendant said to her, "you know Leroy is in there, . . . he is just teasing you. You know how he teases you all

the time." Defendant began to cry when Mrs. Rawlings came running back and said Leroy is dead.

Dr. James Bellenger, Montgomery County Medical Examiner, testified he arrived on the scene of the homicide at about 3:50 A.M. He found three bullets had penetrated the body, two in the chest and one in the head. He says the room was quite hot, which would retard rigor mortis. He calculated the death to have occurred somewhere between an hour or two up to four or five hours prior to his getting there. It was not possible to fix the time of death any closer without knowing how long the heater had been turned on in the room.

Emmett Metcalf says that on the night of the homicide he left the American Legion Club in Clarksville about midnight and went to the Elk's Club. He saw defendant there with Daniel Dix and Josephine Rawlings, but does not recall what time it was. He sat with them at a table and had drinks. They left the Elk's Club to go to defendant's house, after which she was going to drop him off at home. After they arrived at the Hewlett house he heard somebody say something about somebody was running from the house with a white shirt on. He did not know who made the comment. He remained in the car while the other three entered the house. After the body of Leroy Hewlett was found he thought he heard both women "hollering". They then left there and went to City Hall.

Officer Larry Bird testified that when he arrived at the Hewlett home he noticed the bedroom was very hot. The heater in the room was turned on as far as it would go and he turned it off.

It was developed that the deceased had taken out a $20,000.00 accidental death insurance policy on his life on September 21st, 1971, at his place of employment. He also had a $10,000.00 government life insurance policy. Defendant was beneficiary on both policies.

Josephine Rawlings (Ramirez) testified she had known defendant for a number of years, and was acquainted with her husband. He was living in Nashville and she was living on Dodge Street in Clarksville. They were separated. On March 17th, 1972, Daniel Dix and another man came to the witness' at about 7:30 P.M. The other man left shortly and Dix remained. Defendant came to her home later on that night. Dix and the other man had consumed most a half pint of whiskey and had left a little bit in the bottle for her, which she drank. Before defendant's arrival the witness had gone to the SDI store about a block from her home, purchased a six pack of beer at about 11:30 P.M. Daniel Dix walked to the porch and watched while she walked across the street to the store. The store usually closed at midnight. They were mopping the floor and preparing to close when she bought the six pack of beer. About five or ten minutes after she returned from the store defendant came to the back door. She was not aware defendant was coming but had endeavored earlier at about 10:00 o'clock to call her by telephone. Defendant wanted her to go the the house on Lafayette Road with her. The witness asked her if she wanted a beer. When it was declined the witness inquired if she had anything to drink in her pocketbook, she said she did not, but she had been down to the house on Lafayette and left some gin there. Sometime close to 01:00 the three of them departed from witness' house and went to the Elk's Club. They saw a number of people at the Elk's Club, including Emmett Metcalf, whom they joined, at his table. They drank some and remained quite a while. The four of them left together in defendant's car with the witness, defendant, and Dan Dix in the front seat; Metcalf rode in the back. The witness had the impression they were going home until defendant suggested they go out to the house on Lafayette Road. Arriving there they entered the house with defendant leading, she heard no remark by defendant about any person running from the house. They had a conversation about the deceased's car being parked there. Defendant said it was Leroy's car and he was

probably there. Later, after they found deceased's body they were standing in the hallway and defendant said, "Did you see that man run out of my bedroom". Witness said she saw no one. As they were entering, when they reached the door defendant tried to find her key. When she finally found it she couldn't get the door unlocked and sent Mrs. Rawlings to the car to get the flashlight. When they got inside she said witness did not call her husband's name or say anything. They walked through the living room into the hallway and she dropped the matches she was carrying and called defendant's attention to some blood she saw on the floor. Defendant handed her the flashlight and she saw the feet of a man lying there. She returned to the hallway and told defendant there was a man lying in the room and at defendant's request she returned to the room and shined the light on him. She went back and told defendant it was Leroy. Defendant asked if he was dead and she said she didn't know but guessed he was. Daniel Dix then went in to look and reported he was dead. The witness says she began to scream and was admonished by defendant, she didn't need to wake the neighbors. There was no telephone and Mrs. Rawlings started to run to the house next door to call the police and a doctor. Defendant said, "No, wait a minute, I've got to talk to you first." Defendant then said, "Now, listen . . . . . , you know I've been over to your house ever since 9:00. Now, Josephine, you know I've been with you since 9:00." She further said, "Now, listen, if you all stick with me, say, you won't ever have to worry about nothing, you won't have to want for nothing, . . . . . if you just stick with me." Defendant insisted she stop screaming and allow her to talk to her before she would let her call a doctor or the police, and admonished her about being careful what she said to the police when she got there. When they arrived at the police station defendant first declined to go in and then finally followed Mrs. Rawlings. After they reported to the police they returned to the house. The witness says defendant began to cry at that time, but prior to then had shown no signs of grief at the death of her husband. The day after deceased was buried defendant called her and remonstrated with her about not attending the funeral and not coming to the police station to see about her. She also requested Mrs. Rawlings to go talk to her attorney and tell him she saw a man run out of the house with a white shirt on, and that defendant was at her house at 9:00 o'clock that night. Mrs. Rawlings declined to do so because these were untruths. Defendant told her she wanted Mrs. Rawlings to tell these things because she had killed her husband, admonishing her not to tell anybody and to stick by her and she wouldn't want for anything. She says about a year before the homicide, she was at the Hewlett home when they were having an argument in which she became involved. She and defendant left the den, where the argument was taking place and went upstairs to a bathroom. Defendant had a pistol in her hand and urged Mrs. Rawlings to kill her husband, offering her $5,000.00 to do so. They returned to the den, where Mr. Hewlett was either passed out or asleep. The witness evaded the issue by agreeing to shoot him at a later time, with defendant urging that it be done later that night so they could dispose of the body on a dark road. She said she was afraid of defendant.

On cross-examination she admitted to a long series of charges of disorderly conduct and other charges, from operating a disorderly house, to aiding and abetting prostitution. She says she called the defendant about 10:00 on the night of the homicide, at her request, and talked to her grandson as well as her stepfather. She left word for defendant to call her when she got home. They ordered two or three half pints of gin at the Elk's Club, one of which defendant put in her purse. Defendant normally kept a flask in her pocketbook and customarily drank gin. She liked sweet drinks like orange gin or Southern Comfort. Defendant's voice was demanding and cold when she was insisting

that they stick with her. She did not testify at the preliminary hearing that defendant had admitted to her she had killed her husband, and says the reason she did not do so was because she was afraid. She had seen defendant kill a man once. Defendant told her about five minutes afterward that she better not tell it.

Mr. David Parker, manager of the SDI store, stated the closing hour was midnight.

For the defendant, a Mr. John Batten testified he had shared a room with Leroy Hewlett in Nashville for about a month prior to March 17th, 1972, and also worked in the same place with him. It was a Friday night that Hewlett left and never returned. He did not recall the date. He last saw him about 9:00 o'clock on that night. Hewlett left saying he was going home and the witness assumed he was going to Clarksville.

Another witness testified he lived in the apartment next to Hewlett. They had access to each other's apartments. On a Friday night in the middle of March, Hewlett took two canned drinks from the refrigerator in his kitchen, placed them in a paper sack and took them with him. He left saying he was going to New Providence to see a girl. The witness did not know exactly what hour it was except that it was night.

Another witness observed defendant's car at the Elk's Club on one night a little past 10:00. He saw her and a man and a woman get out of the car. He did not know the date in relation to the night of the homicide.

Irma Hutchinson saw defendant with Metcalf, Dix and Rawlings in the Elk's Club on one Friday night in March. She arrived there about 9:45 and she observed them come in a few minutes later. It was the only time she had ever seen defendant, Rawlings, and Dix in the Elk's Club. She had seen Metcalf in there before.

Robert Oldham, stepfather of defendant testified she lived with him part of the time in March of 1972, along with her grandson. On the night Leroy was killed he received a telephone call from Josephine Rawlings requesting defendant to come to her house. He told her defendant had gone to the washer. When Polly came in he transmitted the telephone message. The next morning Josephine Rawlings called again and asked to speak to Polly. She informed him they had found Polly's husband dead and said Polly didn't do it, and they would never find the pistol.

Defendant testified in her own behalf that on March 17th, 1972, her husband was living and working in Nashville. She had a job there also and was supposed to go the next week. He would come home sometimes on Friday night, but started coming home on Saturday nights. They were planning to sell the house on Lafayette Road. On March 17th she went to the house on Lafayette Road, late in the afternoon, accompanied by Lettie Mae Cooksey, for the purpose of changing the linens on the bed, to straighten up the house and to put some oil in the heater. The electric power had been turned off for about two weeks. After attending to things at the house they returned to Clarksville, stopped at Ira Rector's Restaurant, where she purchased a strawberry pop. They left there and started home when they heard a siren and decided to go see if there was a fire. After a somewhat circuitous journey they went by another place in the general vicinity of her home where Lettie Mae purchased some cigarettes and then went home, arriving there about 08:35. She received the telephone message Josephine had related to her stepfather, then almost immediately Mrs. Rawlings called her again. She went to the Rawlings house. When she arrived Dan Dix was there. They stayed about twenty minutes while Mrs. Rawlings dressed and then went to the Elk's Club. She saw Irma Hutchinson, whom she knew as Bootsie, and Emmett Metcalf. They purchased two half pints of gin which was consumed there at the table, and then left the Elk's Club about 01:00

o'clock to go to the house on Lafayette Road. She says she went back to see if her husband had come home, and to turn off the heater if he was not there. She wanted to see him because he had promised to bring some money to pay on his car, and it was her intent to go back to Nashville with him to fix up his room. When they arrived at the house on Lafayette Road, Josephine went in first, Dan second, and she went in last. The front door was open. She left the doors unlocked so potential purchasers could go in to look at it. When Josephine said there was a man laying over there dead who looked like Leroy she fainted, or had a blackout, and they carried her out of the house and laid her down on the ground. She wanted to go back in but Josephine would not let her. They decided they had to do something and she hated to wake up the neighbors because she didn't know many of them and she suggested they drive on down to find a phone. If they could not find anything open they would go to the police station. Josephine wanted to stop some place and get cigarettes and whiskey but no place was open. After they returned from the police station, the officers would not let her in the house. She says she was with Dan and Josephine from sometime before midnight until the time that deceased's body was found. That she was with Lettie Cooksey until about 08:30. She says they arrived at the Elk's Club about 10:00 and denies that she had anything to drink that night or that she drank at all. She admitted the assault on her husband which was developed in the State's proof but testified she had shot him in self-defense because he was attacking her with a butcher knife. She says if she told Lt. South that she guessed she was going to have to kill Leroy it was just a way of speaking and she didn't intend it as it sounded. She denied any knowledge of insurance on deceased's life.

This is a circumstantial evidence case and we have recounted the proof in some detail. The jury has seen and heard the witnesses and it is their duty to resolve the conflicts in the testimony which they have heard. We are satisfied that the State's evidence was sufficient to dispel any reasonable doubt in the minds of the jury and they were warranted in returning the verdict which they did. The defendant has failed to carry the burden imposed upon her here, to show that the evidence preponderates against her guilt and in favor of her innocence. McBee v. State, 213 Tenn. 15, 372 S.W.2d 173; Pryor v. State, 217 Tenn. 695, 400 S.W.2d 700; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799.

It is next said it was error for the trial court to deny a motion for mistrial following the unsworn testimony of a State's witness, and in administering the oath to him subsequent to his testimony.

The record shows that the witness, Daniel Dix, was called on behalf of the State, and was not sworn. At the conclusion of this witness' testimony the court recessed, and, upon reconvening, counsel for the defendant advised the court it had been brought to his attention by a spectator that the trial judge had inadvertently failed to swear the witness. This fact was confirmed by the notes of the court reporter. Counsel stated to the court that he had no recollection of the matter and had he been aware the witness was not sworn he would have brought it to the court's attention at the time. The failure to place the witness under oath was obviously an oversight by court and counsel. A motion for mistrial was made and over counsel's objection the trial court then placed the witness under oath and inquired about his prior testimony. The witness was asked whether or not the testimony he gave was true and replied in the affirmative. The trial judge then had the witness to take oath that the testimony he had given in the case was the truth, the whole truth, and nothing but the truth.

We find no precedent in the case law of this State on this precise situation, nor has

any been suggested to us by counsel. In Moore v. State, 96 Tenn. 209, 33 S.W. 1046, error was assigned on the fact that one of the witnesses for the State testified without being sworn and that this fact had only become known to the plaintiff in error after the trial. On this issue our Supreme Court said:

" . . . it is to be observed, while there is an affidavit of the prisoner, stating that he only became aware of the fact that this witness gave his testimony without being sworn after the trial was concluded, yet the record is silent as to when his counsel discovered it. That there was irregularity in thus accepting this testimony is true, but it was one that would easily and promptly have been remedied by the court if attention had been called to it during the trial. The record discloses that, after the examination in chief by the state, he was turned over to the attorneys of the plaintiff in error, who cross-examined him as one fully qualified to testify. Having thus gone forward without inquiry or objection, it must now be taken that there was an implied waiver of the oath of the witness, which is conclusive on the prisoner as well as the state."

█ We accept for fact, as stated in the record, that neither court nor counsel was aware that the witness had not been sworn before giving his testimony. However, under the facts of this case, we do not think this to be grounds for reversal. We find the following in 98 C.J.S. Witnesses, Sec. 320, citing authorities from other jurisdictions:

"The admission of unsworn testimony in a case is a mere irregularity which violates no constitutional provision, and does not effect the jurisdiction of the tribunal, and if unsworn testimony is received in evidence without objection, it may be considered the same as any other evidence in the case. Any error committed by failing to have a witness sworn before he testifies may be cured by in-

structing the jury to disregard such testimony, or it may be cured by having the witness sworn and the testimony repeated, and where a witness after he is sworn reaffirms testimony which he gave before he was sworn, such testimony thereby becomes competent."

There can be no doubt that the course taken by the trial judge in this case adequately resolved the situation which occurred. There is nothing to indicate the witness swore falsely. He was assiduously cross-examined by defense counsel, and he subsequently swore under oath that his testimony was the truth. Defendant has not shown she was in any way prejudiced by this irregularity in the proceedings and we will not put the trial judge in error for an obvious oversight which was corrected in the most expedient way possible. The assignment is overruled.

█ The third assignment charges error to the trial court in failing to grant a motion for a mistrial following the unresponsive statement of the State's witness, Josephine Rawlings (Ramirez) to the effect that she had seen the defendant kill another man previously.

This witness testified on direct examination that defendant had admitted to her she had killed her husband. On cross-examination she was asked if she had testified at the preliminary hearing that defendant had admitted to her at any time she had killed her husband, and replied in the negative. She was then asked, "Was that because no one asked you?" She replied, "Sir? No, sir, that's not the reason—this is the reason I was afraid to tell it. Because I saw Polly kill a man once and she told me about five minutes after she killed him that I'd better not tell it, that I hadn't seen nothing."

This answer was clearly responsive to the question. This witness was clearly entitled to explain the circumstances when her testimony at the preliminary hearing was challenged. On the objection and mo-

tion for mistrial, the trial court adequately and properly instructed the jury to disregard the answer as having anything to do with the guilt or innocence of the defendant in the case. The assignment is overruled.

■ Finally, error is assigned to the trial court's failure to grant a mistrial at the conclusion of all the evidence on the premise that the totality of the inferences with regard to a prior homicide were inflammatory and misleading to the degree they could not be removed from the minds of the jury by the instructions of the court.

We have previously dealt with the testimony of the witness, Josephine Rawlings. It is argued that questions by the State's counsel in regard to service man's insurance on the life of defendant's husband cast an inference of a prior homicide. We have read the record carefully, and taken in context we do not find this to be so. It is clear the intent of the State was to determine the extent of defendant's knowledge in regard to national service life insurance in view of defendant's testimony that she had no knowledge of any insurance of any kind on the life of her husband. A question is raised about questions put to Samuel Hooker, a character witness for the defendant. No objection was made nor was there any request for instructions to the jury at the time of this cross-examination of the witness by the State. The trial judge instructed the jury that any specific questions put to character witnesses concerning their knowledge of prior acts or prior misconduct of the defendant were not proof that defendant had committed such acts and were to be considered only as testing the knowledge of the character witness concerning defendant's character. We do not find prejudice to the defendant and the assignment is overruled.

The judgment of the trial court is affirmed.

DWYER and MITCHELL, JJ., concur.