# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON
_____

|  |  |  |
|---|---|---|
| **CHERYL ANN CUPPLES,** | ) | Chester Equity No. 8278 |
|  | ) |  |
| Plaintiff/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | App. No. 02A01-9408-CH-00193 |
|  | ) |  |
| **LUTHER WAYNE CUPPLES,** | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

_____

From the Chancery Court of Chester County at Henderson.
**Honorable Joe C. Morris, Chancellor**

**Lloyd R. Tatum**,
TATUM AND TATUM, Henderson, Tennessee
Attorney for Plaintiff/Appellant.

**Mary Jo Middlebrooks**,
MIDDLEBROOKS & GRAY, P.A., Jackson, Tennessee
Attorney for  Defendant/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.** : (Concurs)

**McLEMORE, Sp. J.** : (Concurs)

This divorce action involves dissolution of the 25 year marriage between Appellant, Cheryl Ann Cupples ("Wife"), and Appellee, Luther Wayne Cupples ("Husband"). Wife filed for divorce in September 1992, citing irreconcilable differences and inappropriate marital conduct. Husband counterclaimed for divorce alleging inappropriate marital conduct. Both parties sought custody of their minor son, Jonathan, age 10 at the time of trial.[1] On appeal, Wife cites as error the trial court's award of an absolute divorce and custody of the child to Husband, its failure to award her alimony and its division of the marital estate. For reasons hereinafter expressed, we affirm.

The evidence presented at trial includes the following: Husband is 47 and Wife is 44. Both have a twelfth grade education. Wife has maintained "a steady stream of jobs outside the home" since graduation. She currently works as manager of an apartment complex earning a monthly net income of $520. She is also provided a two bedroom apartment which rents for $225 per month. Her past employment has primarily consisted of secretarial and managerial positions paying minimum wage. Husband has been employed with Freed-Hardeman University for approximately 18 years and currently earns an average gross monthly income of $1,904.06. He has also worked as an electrician and possesses some carpentry and plumbing skills.

Wife testified that she was forced to flee the marital home in August 1992 due to Husband's verbal and physical abuse. She described incidents of Husband cursing, pushing and hitting her. Husband stated that Wife began to withdraw from the family approximately four years prior to the divorce proceedings. He suspected problems in the marriage when she began talking on the phone sometimes until 10:00 at night and "all the time" during weekends. He stated that the major difficulty in the marriage involved Wife's lying and her unexplained absences from the home which began during the last couple of years of the marriage. According to Husband, these absences could last anywhere from several hours to several days and, if he inquired about Wife's whereabouts, she either lied to him or simply provided no explanation. Husband complained that Wife spent no time with him or their son. When questioned, on cross-examination, "[h]ave you ever left the household and ever stayed out at night when no one knew where you were, . . . ?", Wife responded, "[y]es, I have." Husband denied ever physically abusing Wife. He admitted cursing her, but stated

---

[1]Another child born of the marriage was an adult at the time of trial.

that his arguing in such manner mostly occurred after Wife began leaving the marital home without explanation. He believed this behavior on his part "wrong," but denied that it was the reason for the breakup of the marriage. He admitted to an extramarital relationship after the parties separated.

Mozel Blakely, Wife's aunt, also testified that on occasion other family members would inquire from her as to Wife's whereabouts, insisting that Wife told them that she would be spending the night with her aunt. Ms. Blakely stated, "[t]he whole family didn't know where she was. Just in a mad rage she'd take off and leave and didn't anybody know where she was." Ms. Blakely stated that this happened many times, disturbing everyone on the weekend and that Wife never stayed the night with her.

Wife admitted making two withdrawals in July 1992 of approximately $19,000 from the couple's savings account and taking certain items of personalty with her when departing the home. Husband testified that he did not know the funds were being withdrawn. Wife stated that her living expenses since the separation have totalled $27,457.99 and that Husband did not provide any funds for these expenses, other than child support.[2]

Wife stated that she was the primary caretaker of Jonathan during the marriage. She purchased his clothing, made certain he received medical attention when needed and was the primary disciplinarian. She complained that Husband rarely disciplined Jonathan and, on the few occasions he did, it was handled poorly by cursing the child. Both parties attended parent/teacher conferences at Jonathan's school and participated in certain school activities involving their son. Wife testified that Husband transported Jonathan to and from school "once or twice a week." She stated that all three attended church, although Husband failed to go at times, and that she taught some Bible classes. Wife believes that she is more fit to care for Jonathan because "a ten-year-old child should live with his mother." She also believes that Husband's cursing and failure to discipline his son negatively influences him. She expressed a dislike for Husband's attempts to "buy" his son and claimed that Husband had spoken badly about Wife to Jonathan. In professing love for her son, she acknowledged Husband's love for him also. Wife admitted cursing in the child's presence.

---

[2]Wife was awarded temporary custody and child support in the amount of $306.39 per month.

Husband believes himself more fit to care for Jonathan, citing the inadequate amount of time spent by Wife with her son. Husband stated that, since the separation, Wife often times leaves Jonathan with someone else or has someone else pick him up from school. He testified that during the marriage Wife sometimes refused to take care of Jonathan when it was necessary for Husband to work on the weekends and, thus, Jonathan would accompany his father to the work site. Also, Husband has considered the many activities that he and his son partake, including hunting, fishing and baseball. Husband has, in the past, coached his son's baseball team. Husband denied ever verbally or physically abusing Jonathan. He declared, "I can give [Jonathan] a good home. I can stay with him. . . I can take care of him, for I don't think he's being taken care of with [Wife]." On cross examination, however, Husband agreed that Wife has been a good mother to her son.

The trial court heard additional testimony relating to the custody issue from various friends and family members. Wife's sister and two aunts testified that they believe Husband the better parent to care for Jonathan. Melton Sewell, president of Freed-Hardeman, testified that Husband is "a devoted father" and that "[he] loves his son." Dee Letty Shires testified that Wife and her son have a "good relationship" and that Wife is a "good mother." She described an incident when children were playing baseball in the Cupples' backyard and Husband became very upset, cursing and telling everyone to leave. Husband refuted this testimony. The trial court also conducted an in chambers conference with Jonathan regarding his choice for custody upon Husband's "Motion for Expression of Child Custody Preference."

The marital real estate, consisting of 26 acres, was purchased at various times during the marriage from Wife's parents or her father, after her mother's death. The marital home was constructed on a portion of this property. Wife requested that she be awarded this realty because she "was born and raised on this property" and had "lived there for forty-four years." The road on which the marital realty is located is named McGill, her maiden name. Her grandparents lived on adjoining property. She identified certain other property, which is surrounded by the marital realty, as her father's home prior to his death. This property was devised to Wife by her father in his will.

The final decree awarded an absolute divorce and custody of Jonathan to Husband, with Wife receiving liberal visitation. Wife was ordered to pay child support in the amount of

$120.96 per month. Husband received the marital residence and accompanying acreage, with an agreed value of $76,800. Each party received his or her IRA, valued at $1,104 and $5,700, respectively. Husband was awarded the furniture remaining in the home, approximately $30,500 from his pension and various other items of personalty valued between $5,000 and $9,000. Husband was ordered to assume paying two debts totalling $7,600. Wife was awarded the savings account in the approximate amount of $22,000 which she closed, a 1985 Blazer, valued at approximately $5,000, the household furnishings in her possession and the remaining balance of Husband's pension, approximately $61,000. She was also awarded $3,000 in attorney's fees.

Wife presents the following issues on appeal:

I. Whether the trial court erred in awarding custody of the parties' minor child to Husband.

II. Whether the trial court erred in awarding an absolute divorce to Husband.

III. Whether the trial court erred in failing to award alimony to Wife.

IV. Whether the trial court erred in its division of marital property.

Wife's first issue concerns the trial court's custody award. The "Order for Absolute Divorce" indicates that the court's decision to award custody to Husband was "[b]ased on all of the testimony, including that of the family members, . . . . " Wife argues that the testimonies of her relatives, on which the trial court "relied heavily," reveal a lack of any real personal knowledge on their part regarding the relative fitness of the parties and do not support an award of custody to Husband. Indeed, all three of Wife's relatives testified that they were infrequent visitors to the parties' home during the marriage. Their limited encounters with the family, however, including those with father and son since the separation led them to conclude that Husband was the better custodial parent for Jonathan.

Wife's argument appears directed at the apparent weight given these testimonies by the trial court. The weight, faith and credit to be given to any witness' testimony lies in the first instance with the trier of fact and the credibility accorded will be given great weight on appeal. *Leek*

*v. Powell*, 884 S.W.2d 118, 120 (Tenn. App. 1994). The trial court's judgment expressly states that the testimonies of all witnesses were considered, including that of the parents and child, when awarding custody to Husband. Having reviewed the entire record in this case in accordance with Rule 13(d) T.R.A.P., we cannot say that the evidence preponderates against the trial court's findings regarding custody of this child.

Wife additionally challenges the trial court's custody decision based on the fact that her son was not placed under oath when testifying as to his preference before the trial judge. Prior to amendment in 1994, T.C.A. § 36-6-102(a) and (b) read as follows:

> In a suit for annulment, divorce or separate maintenance, where the custody of a minor child or minor children fourteen (14) years of age or older is a question, the court shall, upon the sworn motion by either party that such child or children has expressed a desire to make his or their custody preference known to the court, and prior to the award of care, custody and control of such child or children, seek the preference of such child or children relative to the parent with whom he or they desire to live. The court, in its discretion, may receive the testimony of such child or children out of the presence of the parties to such action. The preference of such child or children shall not be binding upon the court but shall be a factor the court shall consider in determining which parent, if either, should be awarded care, custody and control of such child or children.
> (b) If the child or children in question is under fourteen (14) years of age, the court, using the same procedure as is set out in subsection (a), may consider the preference of the child or children relative to the parent with whom he or they desire to live.

Wife relies upon Rule 603 of the Tennessee Rules of Evidence and the Tennessee Court of Criminal Appeal's decision, *Hewlett v. State*, 517 S.W.2d 760 (Tenn. Crim. App. 1974), to argue her position. Rule 603 provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with a duty to do so." An issue in *Hewlett* was whether the trial court erred in failing to grant defense counsel's motion for a mistrial after the trial court inadvertently received a witness's unsworn testimony. After discovery by counsel, the witness took oath that his prior testimony was truthful. *Hewlett* found the trial court's hearing of such testimony insufficient grounds for reversal and, in quoting 98 C.J.S. *Witnesses*, § 320, reasoned as follows:

"The admission of unsworn testimony in a case is a mere irregularity which violates no constitutional provision, and does not [affect] the jurisdiction of the tribunal, and if unsworn testimony is received in evidence without objection, it may be considered the same as any other evidence in the case."

*Hewlett*, 517 S.W.2d at 766-67 (alteration added). The record before us does not reflect that counsel objected to the taking of the child's unsworn testimony at the trial level. A party may not save an infirmity in the proceedings as an "ace in the hole" to be used in case of an adverse decision or suppressed in event of a favorable decision. *Harwell v. Walton*, 820 S.W.2d 116, 120 (Tenn. App. 1991). We conclude that Wife has waived this argument on appeal.

Wife next questions the trial court's award of an absolute divorce to Husband, arguing that the evidence clearly reveals that the precipitating factor in the breakup of the marriage was Husband's physical and verbal abuse. As to this issue, the final decree reads:

In this cause, the Court is of the opinion that Mr. Cupples should be granted an absolute divorce from Ms. Cupples, based on the testimony of her unexplained absences from the home, which amounts to inappropriate marital conduct. The activities of Ms. Cupples caused the separation of the parties and the dissolution of the marriage. The Court recognized that Mr. Cupples did have an adulterous relationship long after the parties had separated, which was not a factor in this unfortunate divorce case.

The record presents conflicting testimony as to the reason behind Wife's departure from the marital home. Wife asserts that she left due to Husband's abuse. Husband admits using inappropriate language with Wife, but denies any physical abuse. He further testified that the verbal abuse was prompted by Wife's unexplained absences from the home and unwillingness to associate with Husband and child. Obviously, a credibility issue is presented and from the decision rendered, it is clear that the trial judge accredited Husband's testimony. The trial court's findings of fact dependent upon the credibility of witnesses are entitled to great weight by this Court. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. App. 1988). We conclude that a preponderance of the evidence supports the trial court's award of an absolute divorce to Husband.

As to the division of marital property, Wife first challenges the trial court's

consideration of the couple's savings account, in the approximate amount of $22,000, when dividing the estate. She argues that these funds were used to defray her necessary living expenses after the couple's separation and should not have been considered when dividing the estate because they no longer existed at the conclusion of trial. It is undisputed that these funds represented the couple's joint savings over a 25 year period. The fact that Wife chose to withdraw the funds prior to trial and deplete this asset within a fifteen month period does not affect its classification as marital property, subject to division. Furthermore, Wife's position that the entire funds were utilized as necessary living expenses is not supported by the record. During the time period of the couple's separation, Wife's net earnings, including the apartment rental value, totalled $745. Husband provided child support in the amount of $306.39 per month, for a total of approximately $1,050. Wife's financial affidavit lists her monthly living expenses at an additional $300, but is admittedly based on Wife's projected living expenses if she were awarded the marital home and custody. She testified that she could live "some cheaper" by residing in her apartment. We find no error by the trial court in considering this asset when dividing the marital property. Wife also questions the amount awarded, arguing that she only withdrew approximately $18,000. If there be any miscalculation by the trial court in this regard, we do not find it to render the court's division inequitable.

Wife further argues that an equitable distribution requires that she be awarded the marital home and 26 acres because it is her ancestral property. The record establishes that this real estate was purchased during the couple's marriage and that both parties physically assisted in the construction of the residence. We note that in dividing the marital estate, T.C.A. § 36-4-121(d) provides that courts "shall give special consideration to a spouse having physical custody of a child . . . of the marriage" when making an award of the family home. Certainly this was considered by the trial court when awarding the marital residence to Husband. We appreciate the sentimental attachment that Wife has for this property, but point out that our decision in no way prohibits her from residing in the immediate area, and on McGill Road if she chooses, due to her ownership of the property devised under her father's will. We conclude that no error was committed by the trial court in this regard.

Finally, we address Wife's issue regarding the trial court's failure to award alimony.[3] Need and ability to pay are the cornerstones for awarding alimony. Fault is also to be considered. *Gilliam*, 776 S.W.2d at 86. Wife has requested alimony in the amount of $500 per month. We are satisfied that when considering all relevant factors, including the parties' attainment of the same education level, Wife's possession of some marketable job skills and the marital assets awarded Wife, no error was committed by the trial court in failing to award additional alimony.

The judgment of the trial court is affirmed and this cause remanded for any further proceedings herewith consistent. Costs are taxed to Cheryl Ann Cupples, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
McLEMORE, Sp. J. (Concurs)

---

[3]The record establishes that the trial court awarded attorney's fees to Wife, which we treat as alimony. *See Gilliam*, 776 S.W.2d at 86. Thus, we consider this issue in respect to the trial court's failure to award any additional alimony.