# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 8, 2013 Session

## STATE OF TENNESSEE v. MICHAEL LYNN POSTON

**Appeal from the Criminal Court for White County**
**No. CR4761     David A. Patterson, Judge**

---

**No. M2012-02321-CCA-R3-CD - Filed January 28, 2014**

---

The defendant, Michael Lynn Poston, appeals his White County Criminal Court jury conviction of aggravated sexual battery claiming that (1) the trial court erred by denying his motion for recusal; (2) the trial court erred by denying his motion for change of venue; (3) the trial court erred by failing to swear the victim prior to her testimony; (4) the trial court erred by admitting certain hearsay testimony; (5) the evidence was insufficient to support his conviction; and (6) the sentence was excessive. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

John P. Partin (post-trial and on appeal), McMinnville, Tennessee; and Samuel J. Harris (at trial), Cookeville, Tennessee, for the appellant, Michael Lynn Poston.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall A. York, District Attorney General; and, Philip Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

After the White County grand jury charged the defendant with one count of aggravated sexual battery, the trial court conducted a hearing on September 26, 2011, on the defendant's motion for a change of venue, which was based on the victim's father's being an employee of the trial court clerk's office. At that hearing, Beverly Templeton, the White

County Criminal Court Clerk, testified that the victim's father, J.M.,[1] was one of her six employees. Ms. Templeton testified that J.M. had worked for the Clerk's office for approximately three and one half years and that he was responsible for child support and civil court. Ms. Templeton confirmed that she was familiar with the basic facts of the instant case, and she stated that she also knew the defendant. Ms. Templeton acknowledged that, as jurors entered the courthouse, they would pass by the Clerk's office, where they could potentially see J.M. through a glass window and associate him with the Clerk's office. On cross-examination, Ms. Templeton testified that J.M. did not regularly handle criminal case files, even though he had access to them. She affirmed that, if the trial court allowed the trial to proceed in White County, she could take appropriate precautions to ensure that J.M. would not have access to the file in the instant case.

The trial court ruled that the defendant had failed to show, at that time, that he could not receive a fair trial in White County. The court, however, agreed to leave the matter open until jury selection so that the defendant could be given "the opportunity to show the court that a jury cannot be selected from White County."

The trial court conducted a jury trial in January 2012. The victim, J.R.M.,[2] testified that she was 10 years of age and that she resided with her parents and her older brother. The victim testified that, on the evening of October 23, 2010, she was at home with her brother, her maternal grandmother, Mrs. Poston, and her stepgrandfather, the defendant. Mrs. Poston and the defendant were babysitting while the victim's parents were attending a Halloween party. The victim, her brother, her grandmother, and the defendant were all watching television in the living room, and, at some point, the defendant stood up and walked to the victim's parents' bedroom. The victim then decided to follow the defendant. The defendant was in bed, and the victim, who was wearing pajamas, went to bed as well. The victim fell asleep and woke up to the feel of the defendant's hands "[r]ubbing and pressing" on the victim's "chest, [her] butt, and [her] vagina." While the defendant was touching her, the victim was aware that "[t]he TV was on, I heard a phone, a zipper, and the bed was shaking." The victim felt scared, and she got out of the bed and went into the bathroom. She testified that, when she reached the bathroom, she was "crying" and "burning," and she asked her brother to get her grandmother. When her grandmother entered the bathroom, the victim told her what had happened. The victim's grandmother then drove the victim and her brother to pick up the victim's mother. When they returned to the victim's house, the defendant was no longer there.

---

[1] To protect the anonymity of the minor victim, we refer to her adult relatives by their initials.

[2] It is the policy of this court to refer to minors by initials.

On cross-examination, the victim admitted that she had, at one time, a very good relationship with the defendant, whom she called "Pa," and that she had considered him to be her best friend. The victim denied following the defendant to the master bedroom when he first left the living room, stating that when she became bored with the movie some time later, she left the living room and went to the master bedroom. The defendant was watching television in the master bedroom, and the victim watched television with him "for a couple of minutes" before she fell asleep. The victim admitted that her brother had walked by the bedroom several times and looked into the room.

Following the victim's testimony, the prosecutor requested a bench conference, at which point the following exchange occurred:

Mr. Hatch:     Your Honor, I don't believe [the victim] was sworn at the beginning of her testimony.

The Court:     I failed to swear the witness? We'll do that now.

(Attorney[s] return to counsel table.)

The Court:     [J.R.M.], the attorneys told me something that I forgot. Very simple. Would you raise your right hand?

(Witness is sworn.)

The Court:     And let me ask you, you've just testified and talked to both of the attorneys and answered their questions. Did you keep that oath, did you testify truthfully when you did that?

[J.R.M.]       Yes.

The Court:     Any other questions?

Mr. Hatch:     No, Your Honor.

Mr. Harris:    No, Your Honor.

The Court:     You may step down. Any reason why she would be recalled?

Mr. Hatch:    No, Your Honor.

The Court:    For you, Mr. Harris?

Mr. Harris:    No, Your Honor.

J.R.M.'s 12-year-old brother, J.L.M., testified that, on October 23, 2010, he and the victim were watching a movie at their house with his grandmother and the defendant while J.L.M.'s parents were attending a party. J.L.M. stated that the defendant left the living room at some point and retired to the master bedroom, and at some point, the victim left to go to the master bedroom as well. J.L.M. then left the living room and went to his own bedroom, which was past his parents' bedroom. When he walked past the master bedroom, he saw both the victim and the defendant underneath the covers in the bed. J.L.M. later left his bedroom and returned to the living room. When he passed the master bedroom, he again witnessed the victim and the defendant underneath the covers. While J.L.M. and his grandmother were sitting in the living room, the victim ran down the hallway and was crying, which J.L.M. testified was "very unusual." J.L.M. stated that the victim ran into the bathroom and locked the door. J.L.M. attempted to enter the bathroom, but the victim would not allow him to enter. The victim told J.L.M. to tell their grandmother to come to the bathroom. After his grandmother entered the bathroom, J.L.M. waited in the house "for a while," and he then decided to go outside because the defendant had left the house and was shooting basketball. J.L.M. then went back inside the house to check on the victim, who was still in the bathroom with their grandmother. J.L.M. described the victim as having "blood shot red" eyes and stated that "she was still crying and she looked scared." J.L.M. testified that his grandmother "was crying also and she looked awkwardly."

J.L.M. testified that his grandmother then put both J.L.M. and the victim in the defendant's truck. He stated that the defendant attempted to get into the truck with them, but his grandmother would not allow him to enter the vehicle. J.L.M.'s grandmother drove the two children to the party their parents were attending and picked up J.L.M.'s mother. At that point, J.L.M.'s grandmother told his mother what had happened to the victim, and his mother "was sad and crying and mad at the same time." The group returned to J.L.M.'s house, but the defendant was no longer there, and J.L.M. testified that the defendant did not return to the house that night or the following morning.

On cross-examination, J.L.M. testified that, when the defendant left the living room to go the master bedroom, the victim followed soon after. Approximately five minutes later, J.L.M. walked back to his own bedroom to watch television. J.L.M. acknowledged that the door to the master bedroom was always open, and he stated that he walked past the master bedroom "six or seven times." J.L.M. testified that he made eye contact with the

-4-

defendant when walking past, but he did not speak to him. J.L.M. agreed that the television in the master bedroom was on, but he did not know what the defendant was watching. J.L.M. testified that his grandmother never walked down the hallway to check on the defendant or the victim. J.L.M. estimated that the distance between the living room and the master bedroom was approximately 50 feet down a hallway. J.L.M. admitted that he did not see anything that had transpired in the master bedroom between the defendant and the victim. J.L.M. testified that the defendant left the house to shoot basketball and that he followed the defendant outside, where he stayed for less than five minutes. J.L.M. returned inside when he heard his grandmother calling for him.

J.L.M. admitted that, when he and the victim got in the defendant's truck with their grandmother, their grandmother did not inform the defendant of where they were going, and he acknowledged that his grandmother was angry with the defendant. J.L.M. stated that, when the defendant grabbed the door handle of the vehicle, his grandmother told the defendant, "[N]o," and she backed out of the driveway. Their grandmother had locked the door to the house, and J.L.M. admitted that the defendant could not get back inside. J.L.M. acknowledged that he never witnessed the defendant's doing anything inappropriate with the victim or anyone else.

Mrs. Poston, the victim's grandmother and the defendant's wife, testified that she and the defendant had been married for 26 years. On the evening of October 23, Mrs. Poston and the defendant were babysitting Mrs. Poston's daughter's children, J.L.M. and the victim. Mrs. Poston and J.L.M. were watching television in the living room when Mrs. Poston heard the victim "just kind of sniffing" behind her. The victim then went into the bathroom, and Mrs. Poston followed her into the bathroom a short time later when J.L.M. indicated that the victim was asking for her. When Mrs. Poston entered the bathroom, the victim was shaken up, crying, and was "visibly upset." At that point, the victim told Mrs. Poston that the defendant "had touched her on her pee pee and touched her on her boobs." Mrs. Poston clarified that the victim referred to her vagina as her "pee pee." After helping the victim calm down, Mrs. Poston took the victim and J.L.M. out of the house, and the three of them got into the defendant's truck. Mrs. Poston testified that the defendant asked what was wrong, but Mrs. Poston did not allow the defendant to enter the vehicle. Mrs. Poston drove the children to pick up their mother, and the group returned to the house. Mrs. Poston stated that, when they returned to the house, the defendant was no longer there, and she did not see him return to the house that evening or the following morning.

On cross-examination, Mrs. Poston stated that, during the course of the evening of October 23, she went to the bathroom, and she noticed the victim and the defendant on the bed in the master bedroom watching television; she noticed that the victim was giggling. Nothing seemed out of the ordinary at that time. Mrs. Poston acknowledged that, when she

left the victim's home on October 23, she locked the door and took the defendant's truck. She also admitted that the defendant's car keys also contained the keys to the defendant's and Mrs. Poston's house so that the defendant was unable to access either residence.

Deputy Bobby Farris with the White County Sheriff's Department testified that he responded to a possible sexual misconduct call at the victim's residence at approximately 1:00 a.m. on October 24, 2010. Upon his arrival, he encountered Mrs. Poston, the victim's mother, D.M., and the victim, whom he described as "pretty much hysterical, very upset, crying continuously." After interviewing those present, Deputy Farris determined that the defendant was the suspect in the alleged aggravated sexual battery, but the defendant was no longer present at the residence. Deputy Farris conducted a search of the immediate area around the victim's residence, and he then searched for the defendant at both his current and former residences, as well as the residence of a friend of the defendant's. Deputy Farris's shift ended at 6:30 a.m., and he had been unable to locate the defendant.

On cross-examination, Deputy Farris admitted that he could not recall with any certainty whether he had attempted to contact the defendant on the defendant's cellular telephone. Deputy Farris stated that he neither knew that the defendant had been locked out of the house, nor was he aware that the defendant did not have access to his truck or the keys to his own house.

Investigator Terry Hembree with the White County District Attorney General's Office testified that he interviewed the defendant on October 27, 2010. After signing a waiver of rights form, the defendant consented to speak with Investigator Hembree. According to Investigator Hembree, the defendant claimed to have a "very good relationship" with the victim. The defendant admitted to lying on the bed with the victim in the master bedroom of her residence on the evening of October 23 for "approximately two hours" while the two of them watched television. The defendant said that the victim had fallen asleep "briefly" and that she later left the bedroom to go into the living room. The defendant did not mention anything about the victim's crying. The defendant claimed that, after the victim left the bedroom, he went outside to "use the bathroom" and play basketball. While he was outside, the defendant heard the victim crying but "he was not aware of any reason" why she would be crying. The defendant stated that he saw his wife leave with the grandchildren but that she would not tell him why they were leaving the house. The defendant initially told Investigator Hembree that he left the house shortly after his wife left, but he later stated that he remained at the residence until his wife returned to the house with the grandchildren. His stated reason for leaving the house was that "he had gotten into an argument with [Mrs. Poston] and that he decided he was just going to walk home." The defendant confirmed that, as he was walking away from the victim's house, he saw a sheriff's department car "fly past him." Investigator Hembree asked the defendant if he had called his family to check on their

-6-

welfare after seeing the sheriff's department car speeding toward his stepdaughter's house, and he responded, "[T]hey didn't call me."

On cross-examination, Investigator Hembree admitted that he had sent the defendant's cellular telephone to the Tennessee Bureau of Investigation Crime Laboratory ("TBI Crime Lab") to determine if there were any photographs on the telephone that would constitute the sexual exploitation of a minor, and the TBI Crime Lab was unable to find any inappropriate photographs on the defendant's telephone.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected to testify.

The defendant testified that he had been married to Mrs. Poston for 26 years and that Mrs. Poston's daughter, D.M., was four years old when they married. On the evening of October 23, 2010, the defendant and his wife arrived at the victim's house in the late afternoon to babysit their grandchildren. After the victim's parents left to attend a party, the defendant, Mrs. Poston, J.L.M., and the victim were watching a University of Tennessee football game in the living room. At some point, the victim indicated that she was hungry, and the defendant and the victim went into the kitchen to make something to eat. When they returned to the living room, Mrs. Poston had changed the television channel to a different program. After finishing his food, the defendant announced that he was going to the master bedroom to watch the football game, and the victim told him that she was going to accompany him. The defendant eventually lost interest in the game, and he began changing channels. The victim asked the defendant to turn the television to her favorite cartoon channel, and he complied. The defendant stated that he and the victim watched the cartoon channel for a little over one hour, and, at some point, he believed that the victim had fallen asleep.

The defendant testified that the bed in the master bedroom faced the hallway and that the bedroom door was always open. The defendant recalled J.L.M.'s walking past the room two to three times, and he stated that his wife entered the master bedroom two to three times while he was watching television with the victim. The defendant testified that both the victim and J.L.M. had slept in the bed with him and Mrs. Poston in the past.

The defendant denied touching the victim in an inappropriate way on the evening of October 23, and he denied using his cellular telephone to take photographs of the victim. When asked what prompted him to leave the master bedroom that night, the defendant responded that he "was just tired of laying there and I jumped up, or didn't jump up, I got out of bed and when I got out, I guess it woke [the victim] up, cause she got up and

walked out behind me." The defendant testified that he entered the living room and conversed with Mrs. Poston and J.L.M. for "a few minutes," while the victim stood behind Mrs. Poston. The defendant stated that the victim then turned and walked to the bathroom. A few minutes later, the defendant determined that he, too, needed to use the restroom, so he walked to the bathroom where the victim had gone and discovered it was locked. The defendant then walked outside to relieve himself, and J.L.M. walked outside with him. The defendant and J.L.M. played basketball for a few minutes. The defendant then testified to the events that followed:

> The basketball went toward the front door and then [J.L.M.] come [sic] back and he said Pa, he said Sissy is crying. And I said she is, he said yeah. Well we kept playing basketball and he said wonder what she's crying for. I said Honey, I don't know, but I says we'll find out. And he said well I seen Nanna going in there. And I said well, Nanna will come out and she'll tell us why in a few minutes.
>
> And it wasn't but just a few minutes [Mrs. Poston] come out and she called for [J.L.M.] to come back in. And he come, he went in and it wasn't just a few minutes that all three of them walked and me and [Mrs. Poston], she says I'm going to pick [D.M.] up cause [D.M.] is sick. And I said well let me go pick her up and the kids can stay here. She said no, she called me and wanted me to come and pick her up and I want to go pick her up. And I said well let me ride with you, she said I told you you wasn't going and you're not going.
>
> And so I had the keys in my pocket and I throwed them to her. I said here, you'll have to have the keys. And they got in the car and they left.

After Mrs. Poston left with the children, the defendant discovered that the door to the house was locked. He waited outside the house until he saw Mrs. Poston returning in his vehicle, and he then walked around behind the house and "down the mountain." The defendant stated that he left because he "didn't want to argue with" his wife. The defendant testified that he walked to his apartment, but when he discovered that it, too, was locked, he walked "across town" to his mother's house. He denied that he was aware the police were searching for him. In response to questioning about the victim's motivation for leveling these accusations against him, the defendant replied that he had "no idea" why she would make such claims, "[u]nless she was mad or aggravated at me."

Based on this evidence, the jury convicted the defendant as charged of aggravated sexual battery. Following a sentencing hearing, the trial court imposed a sentence of 11 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial judge erred by refusing to recuse himself, by denying the defendant's motion for change of venue, by permitting the victim to offer unsworn testimony, and by permitting certain hearsay testimony. In addition, the defendant contends that the evidence adduced at trial was insufficient to support his conviction and that the sentence imposed was excessive. We consider each claim in turn.

## *I. Recusal*

The defendant first contends that the trial judge erred by refusing to recuse himself on the basis of the judge's familiarity with the victim's father, who was employed as a deputy clerk in the White County Clerk's office.

Our review of the record reveals that the defendant failed to file a written motion for recusal. In support of its position that the defendant waived this issue on appeal for failure to file a written motion, the State cites to Tennessee Supreme Court Rule 10B, which provides that a party seeking recusal or disqualification of a judge "shall do so by a timely filed written motion," supported by an affidavit and alleging with specificity the grounds for the motion. Tenn. Sup. Ct. R. 10B § 1.01. This rule, however, did not take effect until July 1, 2012, and, thus, is not applicable.

Not only are we without a written motion for recusal, but there is no transcript in the record evincing that such a motion was ever made orally. In the transcript of the hearing on the motion for new trial, the defense attorney (who, we note, did not represent the defendant at trial) references "a motion requesting [the court] to disqualify itself and also to deny the defendant's motion for a change of venue." The trial court, in ruling on the defendant's motion for new trial, said that it "considered [the victim's relation to the assistant clerk] on the motion of the defendant's attorney at the time," and that "the court did not find that it had reason to recuse itself and still does not." Both the written motion for change of venue and the transcript of the hearing on the motion for change of venue *are* included in the record, but neither mentions recusal. If there was, in fact, a motion for recusal made by the defendant, the lack of a transcript of a hearing on such motion in the record makes it impossible to conduct a meaningful review of this issue. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(b).

If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). In the absence of a transcript of a hearing on the motion to recuse, we are without the facts upon which the trial court relied to make its determination. Given this deficiency in the record, review of the trial court's denial of the defendant's motion is impossible, and we must presume the trial court's ruling was correct.

## II. Change of Venue

Next, the defendant argues that the trial court erred by denying his motion for change of venue "based upon the peculiar circumstance of the victim's father['s] being a Deputy Clerk of the court trying the case."

The trial court conducted a hearing on the defendant's motion, at which Beverly Templeton, Criminal Court Clerk for White County, testified that the victim's father was one of her six employees but that he was responsible for child support and civil court and did not regularly handle criminal case files. Ms. Templeton also testified that she could take appropriate measures to ensure that the victim's father could not access the file in the instant case. Defense counsel, in questioning Ms. Templeton, placed a great deal of emphasis on the potential that jurors might see the victim's father in the clerk's office and associate him with the court. The trial court preliminarily denied the defendant's motion but held the issue open until jury selection occurred:

> And so I think that what we should do, Mr. Harris, I don't know that you're going to be able to show prejudice until you do have jurors and we find a venire that is tainted. And I will find it quickly and easily if it's there, I hope, and be helped by your wise judgment in it. And I think the state is likely to agree with us if we have some difficulty and we find that when we have forty or fifty in the room, that we have a real difficulty. I think we drop back at that time and perhaps have to set it for another date and another place.

The decision to grant the defendant's motion for a change of venue rests soundly within the discretion of the trial court, and this court will not overturn the trial court's decision absent a "clear" abuse of that discretion. *State v. Davidson*, 121 S.W.3d 600, 611-12 (Tenn. 2003) (citing *State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn. 2002)). "Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id.* at 612 (quoting *Dellinger*, 79 S.W.3d at 481); *see also State v. Mann*, 959

S.W.2d 503, 532 (Tenn. 1997); *State v. Melson*, 638 S.W.2d 342, 361 (Tenn. 1982).

In the instant case, the defendant failed to show that the trial court abused its discretion by not initially granting the motion. As to any action the court took on the motion during jury selection, such a determination is impossible because the defendant failed to provide a transcript of the voir dire proceedings or any further argument on this issue. Again, the burden is on the defendant to prepare an adequate record on appeal, *see Ballard*, 855 S.W.2d at 560, which includes preparation of a transcript of the proceedings "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of a transcript of the voir dire proceedings, we must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

### *III. Failure to Swear Witness*

The defendant next contends that the trial court erred by failing to swear the victim prior to her testimony, as required by Tennessee Rule of Evidence 603, which provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Tenn. R. Evid. 603.

The 10-year-old victim was the first witness to testify at trial. Prior to her testimony, the following exchange occurred:

> Mr. Hatch: The state will call [J.R.M.].
>
> The Court: Come right up. Mr. Hale is holding the seat for you. Come up and have a seat right here, Ma'am.
>
> You and I are going to talk into the microphones and sort of like rock and roll, I suppose. We're going to get close and talk so that everybody can hear. And then if you talk more quietly, then they will be able to hear your voice, too.
>
> Are you ready to testify today?
>
> Witness: Yes.

-11-

The Court:     Okay.  Tell me your name.

The victim provided her name, and the trial court and court reporter verified the spelling of each of her names.  The trial court then allowed the prosecutor to proceed with his questioning.  After establishing some basic biographical information, the prosecutor questioned the victim as follows:

Q:     Have you and I met before today?

A:     Yes.

Q:     And when you and I met, do you understand the difference between the truth and a lie?

A:     Yes.

Q:     Is the truth good or bad?

A:     Good.

Q:     Is a lie good or bad?

A:     Bad.

The prosecutor then proceeded with his direct examination of the victim, followed by cross-examination by the defense attorney.  At the conclusion of his cross-examination, the defense attorney asked the following questions of the victim:

Q:     You've been in [this court room] several times, for example when you came in and they told you where to look when you testified didn't they?

A:     Yes.

Q:     And they, did they comment on how you tell your story?

A:     Not to lie and stuff?

Q:     No, no, no, not to lie.  They, I wouldn't think you would be told to lie, but you were told how to, to rehearse your

-12-

story somewhat, correct?

A:    Yes.

Q:    Okay. And you've done that several times, correct?

A:    Yes.

Q:    No other questions, Your Honor.

The prosecutor then conducted a brief redirect examination, which ended with the following exchange about their trial preparations:

Q:    Each time we were able to meet, did you feel more comfortable?

A:    Yes.

Q:    What did I tell you was the most important thing for you to do?

A:    To tell the truth.

Q:    No further questions, Your Honor.

The defense chose not to question the victim further, and just before the trial court excused the witness, the prosecutor asked the court if he and the defense attorney could approach the bench to address an issue, which resulted in the following bench conference:

Mr. Hatch:    Your Honor, I don't believe [the victim] was sworn at the beginning of her testimony.

The Court:    I failed to swear the witness? We'll do that now.

(Attorney[s] return to counsel table.)

The Court:    [J.R.M.], the attorneys told me something that I forgot. Very simple. Would you raise your right hand?

-13-

(Witness is sworn.)

The Court:    And let me ask you, you've just testified and talked to both of the attorneys and answered their questions. Did you keep that oath, did you testify truthfully when you did that?

[J.R.M.]      Yes.

The Court:    Any other questions?

Mr. Hatch:    No, Your Honor.

Mr. Harris:   No, Your Honor.

The Court:    You may step down. Any reason why she would be recalled?

Mr. Hatch:    No, Your Honor.

The Court:    For you, Mr. Harris?

Mr. Harris:   No, Your Honor.

The State relies on *Hewlett v. State*, 517 S.W.2d 760 (Tenn. Crim. App. 1974), in support of its position that the trial court took appropriate curative measures by swearing the witness at the conclusion of her testimony. In *Hewlett*, the defendant was charged with the first degree murder of her husband, and, at trial, a witness testified about the events prior to the discovery of the victim's body. *Id.* at 760, 762. The trial court failed to swear the witness prior to his testimony, and the mistake was brought to the court's attention at the conclusion of the witness's testimony. *Id.* at 766. The trial court denied the defendant's motion for a mistrial, placed the witness under oath, and asked if his prior testimony had been truthful, to which the witness responded in the affirmative. *Id.* On appeal, this court found that the trial court's actions resulted in an appropriate resolution of the issue:

> We find no precedent in the case law of this State on this precise situation, nor has any been suggested to us by counsel. In *Moore v. State*, 96 Tenn. 209, 33 S.W. 1046 [(Tenn. 1896)], error was assigned on the fact that one of the witnesses for the State testified without being sworn and that this fact had only

-14-

become known to the plaintiff in error after the trial. On this issue our Supreme Court said:

> " . . . it is to be observed, while there is an affidavit of the prisoner, stating that he only became aware of the fact that this witness gave his testimony without being sworn after the trial was concluded, yet the record is silent as to when his counsel discovered it. That there was irregularity in thus accepting this testimony is true, but it was one that would easily and promptly have been remedied by the court if attention had been called to it during the trial. The record discloses that, after the examination in chief by the state, he was turned over to the attorneys of the plaintiff in error, who cross-examined him as one fully qualified to testify. Having thus gone forward without inquiry or objection, it must now be taken that there was an implied waiver of the oath of the witness, which is conclusive on the prisoner as well as the state."

We accept for fact, as stated in the record, that neither court nor counsel was aware that the witness had not been sworn before giving his testimony. However, under the facts of this case, we do not think this to be grounds for reversal. We find the following in 98 C.J.S. Witnesses, Sec. 320, citing authorities from other jurisdictions:

> "The admission of unsworn testimony in a case is a mere irregularity which violates no constitutional provision, and does not effect [sic] the jurisdiction of the tribunal, and if unsworn testimony is received in evidence without objection, it may be considered the same as any other evidence in the case. Any error committed by failing to have a witness sworn before he testifies may be cured by instructing the jury to disregard such testimony, or it may be cured by having the witness sworn and the testimony

-15-

repeated, and where a witness after he is sworn reaffirms testimony which he gave before he was sworn, such testimony thereby becomes competent."

There can be no doubt that the course taken by the trial judge in this case adequately resolved the situation which occurred. There is nothing to indicate the witness swore falsely. He was assiduously cross-examined by defense counsel, and he subsequently swore under oath that his testimony was the truth. Defendant has not shown she was in any way prejudiced by this irregularity in the proceedings and we will not put the trial judge in error for an obvious oversight which was corrected in the most expedient way possible. The assignment is overruled.

*Hewlett*, 517 S.W.2d at 766-767.

The defendant urges us to disregard the holding in *Hewlett* because it was decided prior to the adoption of the Tennessee Rules of Evidence, which instruct that, prior to testifying, "every witness shall be required to declare that the witness will testify truthfully by oath or affirmation." Tenn. R. Evid. 603. We see two problems with the defendant's argument. First, that *Hewlett* was decided before the rules of evidence were adopted in this state does not diminish *Hewlett*'s implicit finding that the failure to swear a witness does not implicate a constitutional violation. *See Hewlett*, 517 S.W.2d at 767 (quoting 98 C.J.S. Witnesses, Sec. 320, which states that the "admission of unsworn testimony in a case is a mere irregularity which violates no constitutional provision").

Second, and most importantly, the defendant failed to object to the admission of the victim's testimony at trial. Because he failed to lodge a contemporaneous objection, and because, as previously noted, the failure to swear a witness has not been deemed an error of constitutional dimension, the defendant has waived our consideration of the propriety of the admission of the victim's testimony. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of the record stating the specific ground of objection if the specific ground is not apparent from the context[.]"); Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State*

*v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987). In the instant case, when the failure to swear the victim was brought to the trial court's attention, the court administered the oath and asked the witness to affirm that her prior testimony had been truthful, which the victim did. The trial court then asked the attorneys for both the State and the defense if they had any questions, and they both responded that they had none. Clearly, the defendant had ample opportunity to object, and he did not. Thus, the defendant has waived our consideration of this issue.

*IV. Hearsay Testimony*

Next, the defendant asserts that the trial court erred by admitting into evidence the victim's statement to Mrs. Poston that the defendant "had touched her on her pee pee and touched her on her boobs," which the defendant claims was inadmissible hearsay not subject to any exception. The State contends that the statement was admissible as an excited utterance.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise provided by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of the inadmissibility of hearsay. Because "no factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* Thus, the appropriate and logical standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo. *Gilley*, 297 S.W.3d at 760-61.

In the instant case, the State sought admission of the victim's statement via the excited utterance exception to the hearsay rule, embodied at Tennessee Rule of Evidence 803(2), which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(2). Three requirements must be met before a statement qualifies for admission pursuant to this hearsay exception:

> The first requirement is "a startling event or condition" that "suspend[s] the normal, reflective thought processes of the

declarant." Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (citations omitted). Our supreme court has stated that the "ultimate test" of admissibility via the excited utterance exception is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, the trial court conducted a brief hearing outside the presence of the jury and, after listening to Mrs. Poston testify to the events preceding the victim's statement, concluded that the victim's statement met the requirements for admission as an excited utterance.

The record supports the ruling of the trial court. Mrs. Poston testified that she suddenly realized that the victim was standing behind her, sniffling. Just as Mrs. Poston noticed the victim's presence, the victim turned and "went straight to the bathroom." Less than a minute later, Mrs. Poston entered the bathroom and found the victim "crying," "shaken up," and "visibly upset," and Mrs. Poston believed that "she had been scared." At that point, the victim told Mrs. Poston that "Pa had touched her on her pee pee and touched her on her boobs." Clearly, this statement relates to the startling event of the defendant's touching the victim's chest and vagina, and it was made while the victim was under the stress from the event, as evinced by the victim's emotional state. Taking Mrs. Poston's testimony with that of the victim, in which she testified that she left the master bedroom just after the abuse occurred, we can determine that the time between the event and the victim's statement was merely a matter of minutes, which was not sufficient to remove the spontaneity of the statement. Accordingly, based upon a de novo application of the law to the factual findings of the trial court, we conclude that the trial court did not err by admitting the victim's hearsay statement.

*V. Sufficiency*

The defendant contends, first, that the trial court erred by denying his motion for judgment of acquittal because the evidence was insufficient to support a finding of aggravated sexual battery, and second, that the evidence adduced at trial was insufficient to support his conviction. We disagree.

A trial judge may direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See* Tenn. R. Crim. P. 29(a); *see generally Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . The victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Finally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Initially, we note that the defendant chose to offer proof following the trial court's denial of his motion for judgment of acquittal at the close of the State's proof. As such, he has waived his right to appeal the denial of his motion. *See Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit the waiver rule promulgated in *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979)); *see also State v. Johnson*, 762 S.W.2d 110, 121 (Tenn. 1988); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). Accordingly, our review of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but also necessarily includes the proof offered by the defendant.

Here, the proof adduced at trial established that the victim, who was then nine years old, had fallen asleep while watching television in bed with her stepgrandfather, the defendant. The victim awoke to the feel of the defendant's hands "[r]ubbing and pressing" on her "chest, [her] butt, and [her] vagina." While the defendant was touching her, the victim was aware that "[t]he TV was on, [she] heard a phone, a zipper, and the bed was shaking." The defendant contends that nothing in the record supports the requirement that the alleged contact was intended for the purpose of sexual gratification. The fact that a nine-year-old girl awoke to discover her stepgrandfather was rubbing her chest, buttocks, and genital area while she simultaneously heard the sound of a zipper and felt the bed shake is more than enough to "be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6).

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence strongly supports the defendant's conviction of aggravated sexual battery.

*VI. Sentencing*

Finally, the defendant argues that the trial court erred in its application of one enhancement factor, resulting in an excessive sentence. We disagree.

The trial court imposed a sentence of 11 years, finding four enhancement factors applicable. First, the trial court found that "the defendant has a previous history of criminal convictions [or] criminal behavior in addition to those necessary to establish the appropriate range." *See* T.C.A. § 40-35-114(1). The court gave "great weight" to this factor, noting that the defendant had two prior felony convictions. Second, the trial court gave "some weight" to the fact that the defendant had previously committed a crime while on probation. *See* T.C.A. § 40-35-114(8). Third, the court gave "great weight" to the defendant's violation of a position of trust in the commission of the instant offense. *See* T.C.A. § 40-35-114(14). Finally, the court gave "some weight" to the personal, psychological injuries inflicted upon the victim. *See* T.C.A. § 40-35-114(6). The trial court

declined to apply the enhancement factors of vulnerability or sexual gratification, finding that those were elements inherent in the crime of aggravated sexual battery itself. *See* T.C.A. § 40-35-114(4), (7). The trial court then considered mitigating factors, declining to apply the factor of the defendant's conduct neither causing nor threatening serious bodily injury. *See* T.C.A. § 40-35-113(1). The trial court found that factor to be inappropriate, given the nature of the crime and the fact that it had applied the enhancement factor relating to injury to the victim. The trial court also declined to apply the mitigating factor of assistance to the authorities. *See* T.C.A. § 40-35-113(10). The trial court did, however, take into consideration the defendant's sustained history of employment, as well as the fact that he was at a low to moderate risk to re-offend. *See* T.C.A. § 40-35-113(13). The trial court then announced that "[e]nhancers bring [the sentence] to twelve, mitigators bring it down one, eleven years to serve, one hundred percent sentence."

On appeal, the defendant argues only that the trial court erred by applying enhancement factor six, that "[t]he personal injuries inflicted upon, . . . the victim [were] particularly great." T.C.A. § 40-35-114(6).

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from" the Sentencing Act. *Bise* at 706.

In the instant case, the record reflects that the trial court considered all relevant

sentencing principles, including the evidence presented at both trial and the sentencing hearing, the presentence report, the nature of the criminal conduct, and evidence of enhancement factors. As a Class B felony, the aggravated sexual battery conviction is sanctioned by a sentencing range of a minimum of eight years and a maximum of 12 years. *See* T.C.A. § 40-35-112(a)(2). With respect to the victim's injuries, Tiffany Singer with the Tennessee Board of Probation and Parole testified about the presentence report she had prepared in the instant case and read the victim impact statement, prepared by the victim's mother and signed by the victim. The "Victim's Personal Reaction" stated as follows:

> It has made m[e] very sad. I do not trust any man. I have very bad dreams at night. When I close my eyes I can still feel him touching me. I cry a lot and always feel like people are looking at me. I always keep the doors locked. It has messed my family up. I feel like some days that I would just die.

Under "Victim's Physical Injuries," it lists "Burning and raw redness in the vaginal area." With respect to treatment, the statement indicates that the victim "was seen at the ER. Also by other specialist. She is in therapy now and will be for several more years." Under "Mental Injuries," the victim's mother states that the victim "cries a lot," is "scared," "feels like people are watching her," has "trouble sleeping," "doesn't feel safe," and "has no trust." In response to questions about therapy, the victim's mother responded that the victim had been in therapy for "over a year" with "several more to go."

This court has held that the application of enhancement factor six "does not require that the injuries be physical, nor does it require expert proof of psychological injury." *State v. Douglas Keith Bear*, No. E2008-01498-CCA-R3-CD, slip op. at 25 (Tenn. Crim. App., Knoxville, filed Feb. 5, 2010) (citing *State v. Arnett*, 49 S.W.3d 250, 260 (Tenn. 2001); *State v. Smith*, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). It is appropriate to apply factor six "where there is specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from this offense. Such proof may be presented by the victim's own testimony, as well as the testimony of witnesses acquainted with the victim." *Arnett*, 49 S.W.3d at 260.

Against this background, we examine the facts of the instant case and determine that the mental injuries suffered by the victim, as demonstrated in the victim impact statement, were "particularly great," *see* T.C.A. § 40-35-114(6), and were "more serious [and] more severe than that which normally results from this offense." *Arnett*, 49 S.W.3d at 260. At the time of sentencing, the victim had been in therapy for more than one year, with "several more to go." She listed extreme issues with trust, safety, and self-consciousness, she "cries a lot," has "trouble sleeping," and sometimes feels as if she "would

-22-

just die." We believe these facts are distinguishable from those in the case advanced by the defendant, *State v. Cleander Cleon Hartman, Jr.*, No. M2000-02441-CCA-R3-CD (Tenn. Crim. App., Nashville, Jan. 17, 2002), in which this court found that the trial court had misapplied factor six when the evidence was confined to the testimony of one of the victims that the sexual abuse she suffered at the hands of her stepfather gave her nightmares, she feared being alone, and she had been in counseling, as well as the testimony of the victims' mother, who testified that the second victim was "closed off" and had been ostracized by friends but refused any counseling. *Id.*, slip op. at 15-16. In the instant case, the evidence provided in the victim impact statement presents a much stronger case for "particularly great" lingering psychological injury. As such, we find no abuse of discretion in the trial court's application of enhancement factor six.

Even if, however, the trial court did misapply this factor, the misapplication of a *single* enhancement factor will not invalidate a sentence when the trial court has not completely departed from the Sentencing Act. *See Bise*, 380 S.W.3d at 706. The defendant challenges neither the trial court's application of the additional enhancement factors nor the trial court's refusal to apply two requested mitigating factors. As such, we conclude that the record supports the length of sentence imposed in this case.

## *VII. Conclusion*

The defendant has waived our consideration of the trial court's denial of his motions for recusal and for change of venue, as well as the trial court's failure to swear the victim prior to her testimony. The trial court did not err by admitting the victim's hearsay testimony. The evidence is sufficient to support the defendant's conviction, and the trial court did not err in sentencing the defendant. Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE